UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | *  *  * |
| v. | *  * |
| MICHAEL J. GALATIS, | Criminal Action No. 1:13-cr-10266-IT  *  * |
| Petitioner. | *  * |

MEMORANDUM & ORDER

March 25, 2025

TALWANI, D.J.

On December 3, 2014, Petitioner Michael J. Galatis was convicted following a 15-day jury trial of conspiracy to commit health care fraud pursuant to 18 U.S.C. § 1349, ten counts of health care fraud pursuant to 18 U.S.C. §§ 1347 and 2, and seven counts of money laundering pursuant to 18 U.S.C. §§ 1957. See Jury Verdict [Doc. No. 186]. Petitioner was sentenced to a term of imprisonment of 92 months, three years of supervised release, an $1,800 special assessment, a $50,000 fine, and $7,000,000 of restitution. See Judgment [Doc. No. 226]. Pending before the court is Petitioner Michael J. Galatis's Motion to Vacate [Doc. No. 397] pursuant to 28 U.S.C. § 2255. For the reasons specified herein, Petitioner's motion is DENIED.

I.   **Background**

   A.   *The Indictment*

The Indictment [Doc. No. 3] charged Petitioner and co-defendant Janice Troisi with one count of conspiracy to commit health care fraud and eleven counts of health care fraud,[1] and also charged Petitioner alone with seven counts of money laundering.

---

[1] One count for health care fraud was later dismissed based on a motion from the government. See Order [Doc. No. 164].

As alleged in the Indictment [Doc. No. 3], Petitioner was the owner and operator of MJG Management, d/b/a At Home VNA ("AHVNA"), a home health agency that purported to provide medical services to individuals in need of home health care. See Indictment ¶¶ 1, 3 [Doc. No. 3]. The Indictment alleged that from at least January 1, 2006, through at least October 2, 2012, Petitioner and Troisi devised a scheme and artifice to defraud Medicare by causing the submission to Medicare of false and fraudulent claims for home health and related services. See id. ¶ 20.

The Indictment alleged that Defendants and their co-conspirators caused the submission of more than $27 million of dollars in false and fraudulent claims to Medicare. See id. ¶ 33. The Indictment alleged, *inter alia*, that Defendants manipulated reports by training AHVNA nurses to complete the forms in a manner that made it appear as though patients were homebound (as required for reimbursement) when they were not. See id. ¶ 26. Defendants recruited a physician, AHVNA's Medical Director Spencer Wilking, M.D., who attended weekly company meetings at which he signed certifications for patients he had never met. See id. ¶ 28.[2]

The Indictment further alleged that Petitioner, but not Troisi, committed several violations of the money laundering statute, 18 U.S.C. §§ 1957 and 2, with the amount of money laundered totaling $699,329.74. See id. ¶ 42.

---

[2] Dr. Wilking pleaded guilty on February 25, 2014, to one count of health care fraud in violation of 18 U.S.C. § 1347. See Plea Agreement, United States v. Spencer Wilking, 13-cr-10333-DPW [Doc. No. 13]. Based on Wilking's substantial assistance and role as a key witness in the government's prosecution of Petitioner and Troisi, the government eventually recommended a sentence of 15 months of incarceration, 24 months of supervised release, a $7,500 fine, asset forfeiture of $42,000, and restitution in the amount of $29,775.86. See Gov't Sentencing Mem., United States v. Spencer Wilking, 13-cr-10333-DPW [Doc. No. 41].

B. *The Trial*

Attorney Alexander J. Repasky was Petitioner's lead attorney at trial.[3] In advance of trial, Attorney Repasky filed motions in limine [Doc. Nos. 90, 91], proposed jury instructions [Doc. No. 88], a trial brief [Doc. No. 89], a notice of intent to present an expert witness [Doc. No. 104],[4] and an opposition [Doc. No. 114] to a motion in limine from the government.

Trial commenced on October 27, 2014.[5] In its opening statement, the government informed the jury, *inter alia*, that it would hear testimony from Dr. Wilking to the effect that he worked at AHVNA, that he signed certifications without seeing patients or reviewing patient files, that not one patient was ever found not to qualify for home health care, that Petitioner repeatedly reassured Dr. Wilking his conduct was legal, and that Dr. Wilking eventually realized the business model was illegal but continued working with AHVNA anyways. See Oct. 28, 2014 Tr. 19:24-22:3 [Doc. No. 243].

---

[3] Attorney Repasky began representing Petitioner before this court *pro hac vice* starting October 9, 2013. In a memorandum filed shortly before trial, after the government raised a potential conflict of interest, Attorney Repasky reported that: "[o]ver the course of the past two years, counsel and Galatis have developed a strong attorney-client relationship built on Galatis's trust in Repasky, due in large part to Repasky's hundreds of hours of pretrial preparation. Together, they have reviewed hundreds of thousands of documents and prepared to present a defense to the charges. Repasky is prepared to represent Galatis at trial on October 27, 2014, has interviewed scores of witnesses in preparation for trial and has fully prepared the defense." Def. Galatis's Mem. ISO his Right to Retain Counsel of Choice at 1-2 [Doc. No. 113]. The court conducted two colloquies with Galatis regarding the potential conflict before swearing in the jury, see Elec. Clerk's Notes [Doc. Nos. 120, 142], and Galatis confirmed that he wished to proceed with Attorney Repasky representing him.

[4] The government moved to exclude the expert or alternatively for a Daubert Hearing [Doc. No. 105], and following that hearing, the expert witness was withdrawn. See Elec. Clerk's Notes [Doc. No. 137].

[5] The trial began as a joint trial of Galatis and Troisi. However, on November 30, 2014, the court declared a mistrial as to Troisi due to a health condition. See Elec. Clerk's Notes [Doc. No. 172]. Troisi was subsequently convicted on all of the fraud charges after a bench trial, and that conviction was affirmed on appeal. U.S. v. Troisi, 849 F.3d 490 (1st Cir. 2017).

In his opening statement on behalf of Petitioner, Attorney Repasky advanced an overarching theory of the case that the services delivered by AHVNA were legitimate. This theory encompassed claims that the patients who allegedly received unnecessary services suffered from diagnoses that required repeat visits, that Dr. Wilking was not required to see patients until 2011 regulations went into effect and that such regulations authorized visits by nurses and other practitioners who reported to Dr. Wilking, and that patients testifying to receiving unnecessary services either overestimated their own capacity or were fearful in the face of a federal investigation. See id. at 34:16-38:24. Attorney Repasky stated further:

> Dr. Wilking, you will see, is an elderly physician that has tremendous health problems. We expect the evidence to show that you will see from his own condition that the threat of this prosecution was probably more than he could take. And I expect that at the end of the day you will see that Dr. Wilking, in fact, did the right thing. Dr. Wilking is a good man. Dr. Wilking was a volunteer with Mr. Galatis many years ago, and you will find that Dr. Wilking is going to tell him the truth. At the end of the day, Dr. Wilking will tell the truth in this case, and I expect that you will acquit Mr. Galatis . . . in this case.

See id. at 38:25-39:11.

Mr. Repasky cross-examined all but one of the government's witnesses at trial.[6] On the fourteenth day of trial, Dr. Wilking testified that, beginning in 2007, he signed certifications without looking at them, that he did not meet face to face with patients even after Medicare regulations began requiring such meetings, and that he never refused to sign a certification. See Dec. 1, 2014 Tr. 15:7-13 [Doc. No. 204-1]; id. at 34:9; id. at 38:20-21; id. at 40:8. He stated that,

---

[6] The trial court interrupted the government's direct examination of Maria Dorcena shortly after she began and ordered that her further direct testimony would not be permitted on the basis offered by the prosecution. See Nov. 13, 2014 Tr. 78:12-16, 88:15-17 [Doc. No. 267]. The court subsequently offered Defendants the opportunity to cross-examine her, and neither Attorney Repasky nor Ms. Troica's counsel chose to do so. See Nov. 17, 2014, Tr. 5:5-10, 15:5-14 [Doc. No. 248].

once he stopped seeing patients, he became uncomfortable signing the certification forms but chose to ignore his concerns. See id. at 39:11-14. He further testified that he raised his concerns with Petitioner on multiple occasions and that Petitioner sought to reassure him by pointing to a section of the Federal Register that Petitioner claimed gave Dr. Wilking authorization to sign the forms. See id. at 52:1-21.

Attorney Repasky engaged in cross examination of Dr. Wilking, during which he, *inter alia*, probed into Dr. Wilking's motive to cooperate with the government to reduce his own sentence, see id. at 125:12-15, challenged Dr. Wilking's view that only nurse practitioners and physicians assistants qualified as non-physician practitioners who could conduct the required face-to-face meetings with patients, see id. at 149:9, and challenged Dr. Wilking's suggestion that there was a conspiracy between himself and Petitioner, which led Dr. Wilking to state that his agreement with Petitioner was a "tacit understanding" as opposed to an explicit agreement to commit Medicare fraud, see id. at 157:4.

Mid-trial, Attorney Repasky filed a motion to exclude the testimony of certain witnesses and for a mistrial. See Mot. to Exclude [Doc. No. 157]. The court excluded those government witnesses and denied the motion to exclude as moot. See Elec. Clerk's Notes [Doc. No. 173]. The government rested and the defense did as well, without calling any witnesses. See Dec. 1, 2014 Tr. 172:16 [Doc. No. 204-1].

In his closing statement, Attorney Repasky portrayed Dr. Wilking as an uncredible witness due to his cooperation agreement with the government. See Dec. 2, 2014 Tr. 116:25-117:7 [Doc. No. 278]. Attorney Repasky averred that that while Dr. Wilking may have engaged in unlawful conduct, he acted on his own, and Petitioner had no role in the unlawful conduct. See id. at 87:19-23.

On December 3, 2014, the jury convicted Petitioner on all counts. See Jury Verdict [Doc. No. 186].

C. *Post-trial Motions and Sentencing*

On December 17, 2014, Attorney Repasky filed on Petitioner's behalf a motion for a judgment of acquittal and a motion for a new trial on the grounds that, *inter alia*, the government failed to prove the elements of conspiracy, failed to prove an intent on the part of Petitioner to commit Medicare fraud, and failed to prove that the United States was defrauded by Petitioner. See Mot. for Judgment of Acquittal at 1 [Doc. No. 191]; Mot. for New Trial [Doc. No. 192]. The court denied both of Petitioner's post-trial motions but sentenced Petitioner to a below guideline sentence. See Elec. Order [Doc. No. 225]; Judgment [Doc. No. 226].[7] Petitioner was ordered to surrender for service of sentence on April 3, 2015. See Elec. Clerk's Notes [Doc. No. 225].

D. *Notice of Appeal and Motion to Stay the Sentence*

Petitioner filed a notice of appeal to the First Circuit on March 9, 2015.[8] On April 1, 2015 (two days before he was due to report to serve his sentence), Petitioner filed a *pro se* motion seeking a 30-day stay of his sentencing so that he could obtain new counsel for the purposes of filing a motion to stay his sentencing pending the outcome of his appeal. See Emergency Mot. to Stay [Doc. No. 232]. In his motion, Petitioner maintained that Attorney Repasky failed to effectively prepare for trial, failed to effectively cross-examine witnesses, failed to call defense

---

[7] Petitioner had a total offense level under the United States Sentencing Commission's Guidelines of 35 and a criminal history category of I, resulting in an advisory guideline range of 168 to 210 months. See Statement of Reasons [Doc. No. 366].

[8] Petitioner appealed the conviction, but not the sentence imposed. See United States v. Galatis, 849 F.3d 455, 457 (1st Cir. 2017) ("There is no appeal from the sentence.").

6

witnesses, and committed other alleged errors that potentially constituted ineffective assistance of counsel. See id. at 1-2.

On April 2, the court denied the motion for a temporary stay, finding that Petitioner had "belatedly filed this motion at the last minute to secure a delay on an improper basis" and that "[t]he issues of ineffective assistance of counsel identified appear to involve recent contrivances seeking to raise strategic judgments regarding which the defendant has been aware for some time and as to which he may properly be deemed to have acquiesced," and further stating that Petitioner could raise any issues of ineffective assistance in a 2255 petition. See Elec. Order [Doc. No. 238].

On February 24, 2017, the First Circuit unanimously affirmed Petitioner's conviction, rejecting Petitioner's arguments that the district court committed reversible error by: (1) allowing Dr. Wilking to testify that he had pled guilty to health care fraud arising from the same scheme without *sua sponte* giving a limiting instruction; (2) permitting certain lay and expert witness testimony; and (3) denying Petitioner's jury instruction as to the meaning of a particular certification requirement in the relevant Medicare provisions. See Galatis, 849 F.3d at 457.[9]

On April 29, 2018, Petitioner filed the pending Motion to Vacate [Doc. No. 397]. This case was reassigned on December 31, 2024.

## II. Discussion

### A. Standing

A petition filed pursuant to 28 U.S.C. § 2255 while an individual is in custody must present "a live case or controversy" when considered by the court, see Spencer v. Kemna, 523

---

[9] Petitioner was represented on appeal by new counsel, Robert L. Sheketoff.

7

U.S. 1, 7 (1998), and thus becomes moot where a petitioner who is released from custody cannot show "some sufficient collateral consequence of the underlying proceeding," Leitao v. Reno, 311 F.3d 453, 455 (1st Cir. 2002). Here, Petitioner filed his Petition while incarcerated but was released while the Petition was pending and, as of November 18, 2024, is no longer on supervised release. See Order [Doc. No. 439]. However, Petitioner still owes restitution. See Request from Probation [Doc. No. 437] (Petitioner owed $6,248,572.66 in restitution as of August 7, 2024). Accordingly, the court finds that Petitioner's 2255 petition is not moot, where Petitioner has a substantial financial interest in the vacating of his conviction.

### B. Ineffective Assistance of Counsel and Prejudice

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). "When evaluating a Sixth Amendment claim of ineffective assistance of counsel brought under 28 U.S.C. § 2255, [courts] conduct a two-pronged inquiry, asking whether (1) counsel provided objectively deficient representation (the performance prong), and, if so, (2) is there 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' (the prejudice prong)?" Torres-Estrada v. United States, 122 F.4th 483, 494 (2024) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)). "The petitioner bears a heavy burden on each prong." Id. (quoting Casey v. United States, 100 F.4th 34, 42 (1st Cir. 2024)).

Petitioner argues that his counsel was ineffective because counsel: (1) told the jury in the opening statement that a cooperating witness for the government would be truthful in his testimony; (2) assured Petitioner that counsel "would put on a full defense and that [Petitioner] had a very good case," when his counsel "had no consistent theory of defense" and "put on no

defense case of any kind"; and (3) proceeded to trial with the intent to "try the case for appeal." See Mem. ISO Mot. to Vacate at 1-2 [Doc. No. 410].

Attorney performance is deficient "[o]nly when counsel's strategy was 'so patently unreasonable that no competent attorney would have made it.'" Torres-Estrada, 122 F.4th at 494 (quoting Watson v. United States, 37 F.4th 22, 28 (1st Cir. 2022)). Perhaps recognizing that the issues raised by Petitioner do not appear to meet this standard, Petitioner suggests an evidentiary hearing is necessary to understand the circumstances that prompted trial counsel to proceed as he did. See Mem. ISO Mot. to Vacate at 1-2 [Doc. No. 410]. But even assuming that an evidentiary hearing would reveal that counsel's opening statements and trial decisions were so patently unreasonable that no competent attorney would have made them, Petitioner cannot establish prejudice. Counsel mitigated any prejudice from the opening statement by subsequently cross-examining Dr. Wilking, including as to his motive for testifying in exchange for a lighter recommended sentence, and attacking his credibility in closing arguments. Counsel also cross-examined each of the government's witnesses, except the one witness whose direct examination was cut short. By Petitioner's own account, "[t]he government had a very strong case." Id. at 3. As the First Circuit noted in finding that Galatis had not demonstrated that the lack of a limiting instruction made any difference to the outcome of the trial:

> The government presented overwhelming evidence against him. This evidence included testimony from AHVNA patients, AHVNA nurses, and primary care providers that showed that AHVNA plainly had not met the requirements for home health services under Medicare and that Galatis and Troisi had falsified the necessary forms to make it appear as if the patients were eligible. The jury reviewed OASIS Forms and Form 485s, submitted by AHVNA to HHS, that made assertions flatly contradicted by the testimony of AHVNA patients, their nurses, and their primary care providers. Dr. Wilking testified that he had routinely certified at the weekly staff meetings that patients were eligible under Medicare, even though he had not actually met with or examined the patients, and that Galatis had known this.

Galatis, 849 F.3d at 460-61.

9

The court similarly finds here that Petitioner has not demonstrated that the asserted errors in counsel's opening statement or other trial decisions would have affected the outcome of the trial. Accordingly, Petitioner has not shown prejudice from counsel's trial conduct.

Petitioner also asserts that counsel was deficient in telling Petitioner he "had a very good case" and maintains that "[a]bsent [counsel's] assurances and if the revelation about trying the case for appeal had been made before trial, [Petitioner] would have considered other alternatives to going to trial with his trial counsel." See Mem. ISO Mot. to Vacate at 1 [Doc. No. 410]. Petitioner notes that "[d]uring plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" Id. at 2 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). Here, even assuming counsel's performance in assuring Petitioner he "had a very good case" was deficient—and this court emphasizes that it is making no such finding here—, Petitioner again would not prevail because Petitioner has not satisfied the Strickland prejudice prong.

In the context of plea negotiations, the Strickland prejudice prong requires defendants to prove that "the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163. In Lafler, the defendant received inaccurate advice from his counsel as to an element of the crime charged—advice that both parties agreed constituted ineffective assistance—, which led defendant to decline a plea offer and proceed to trial, at which defendant was convicted and after which defendant received a sentence that was more than three times longer than the minimum offered in the rejected plea bargain. See id. at 160-61. The Court explained that where a plea is actually offered but rejected, a defendant must show that there is a reasonable probability that: (1) the defendant "would have accepted the plea"; (2) "the prosecution would not have withdrawn it in light of intervening circumstances"; (3) "the court

10

would have accepted its terms"; and (4) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Id. at 164. Applying that framework, the Court held that the defendant had satisfied Strickland's two-part test. Id. at 174.[10]

The government urges the court to find that a petitioner cannot show prejudice where, as here, the government never offered a plea deal. See Gov't Opp. to Mot. to Vacate at 7-8 [Doc. No. 418]. There is a circuit split as to this issue, with some circuits requiring defendants to meet a threshold requirement that a defendant show proof of a plea offer and others allowing a showing to be made without such proof. See Davis v. United States, 143 S. Ct. 647 (2023) (Jackson, J., dissenting from the denial of certiorari). To this court's knowledge, the First Circuit has not weighed in.

But even if a petitioner may in specific circumstances show prejudice even where no plea was offered, such circumstances are not present here. In her dissent from the Supreme Court's denial of certiorari in Davis, Justice Jackson explained why she believed the defendant in that case, whose attorney failed to initiate plea negotiations with the government, likely would have prevailed as to the prejudice prong had the Eleventh Circuit not imposed a threshold requirement of showing a plea offer:

> Davis's allegations established that a favorable plea agreement was a strong possibility, even though no offer actually materialized, because each of Davis's

---

[10] In another case decided on the same day as Lafler, Missouri v. Frye, 566 U.S. 134 (2012), defense counsel did not inform the defendant of a plea offer and, after the offer lapsed, defendant pleaded guilty on more severe terms. See 566 U.S. at 138-39. The Court held that defendant had satisfied the first Strickland prong but remanded for consideration of the second prong, as the analysis of whether the prosecution would have adhered to, and the trial court would have accepted, the earlier plea offer was complicated by the fact that defendant was arrested for an additional offense by the time of the scheduled preliminary hearing and guilty plea. See id. at 150-51.

11

> five codefendants had lawyers who negotiated favorable plea agreements with respect to the same series of armed robberies. And while Davis (who was 18 or 19 years old at the time the crimes were committed) received a sentence of approximately 160 years of imprisonment after his attorney took him to trial, all of Davis's codefendants received sentences of less than 40 years of imprisonment due to plea agreements that enabled the District Court to impose a sentence below the mandatory minimum. The District Court's statements at sentencing were also noteworthy: The judge specifically asserted that, while he thought the appropriate sentence for Davis was 40 years, he was bound by the consecutive mandatory minimums.

See id. at 648.

Here, in contrast, Petitioner's co-defendant, Janice Troisi, also proceeded to trial, and Petitioner has not alleged that she received a plea offer. Dr. Wilking pleaded guilty and cooperated with the government; because of his cooperation, the government recommended a sentence that included 15 months of incarceration and restitution in the amount of $29,775.86. See Gov't Sentencing Mem., United States v. Spencer Wilking, 13-cr-10333-DPW [Doc. No. 41]. But as he testified at Petitioner's trial, his role in the conduct alleged here was largely to sign certifications for patients he did not see—quite a different role from that of Petitioner, who owned and managed AHVNA, which orchestrated the entire scheme. Accordingly, Dr. Wilking's ability to enter a plea agreement and his receipt of a lighter sentence due to his cooperation is of little utility in determining that a favorable plea agreement was a strong possibility.

Beyond these shortcomings, Petitioner points to no other facts that would make likely that he "would have accepted the plea" if one had been offered. Unlike the defendant in Davis, Petitioner was not facing a statutory mandatory minimum. And Petitioner's prejudice showing is not helped by his decision to maintain his innocence throughout trial as well as during sentencing, after the jury found him guilty. See Galatis Sentencing Mem. at 5 [Doc. No. 222] ("There was no plea agreement in the case since the defendant maintains his innocence."). Even in his pending petition before this court, Petitioner does not admit that he is guilty of the crimes

12

for which he was convicted but instead suggests that he would have made different strategic decisions had he been apprised of his chances at trial. Even if maintaining one's innocence is not dispositive, see Baker v. United States, 109 F.4th 187, 202 (3d Cir. 2024) (rejecting the idea that an insistence on innocence is dispositive as to a willingness to accept a plea offer and explaining why, in some circumstances, such insistence is only weakly probative), Petitioner's repeated unwillingness to admit guilt does nothing to strengthen his entirely speculative argument that he was prejudiced by his counsel's reassurances that he had a good case.[11]

Petitioner maintains that "[e]ven if there was no plea bargain offered, a guilty plea would have resulted in a lower guideline." Mem. ISO Mot. to Vacate at 3 [Doc. No. 410]. A guilty plea could have reduced his offense level by two or three levels for acceptance of responsibility, see U.S.S.G. § 3E1.1, to an offense level of 32 and a guideline sentencing range of 121 to 151 months, see 2015 U.S. Sentencing Guidelines Sentencing Table, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2015/Sentencing_Table.pdf (last visited March 24, 2025); Statement of Reasons [Doc. No. 366]. Petitioner's sentence of 92 months still falls well below that guideline range. Regardless, Petitioner has not alleged facts to render his suggestion that he would have entered a guilty plea with different counsel anything more than speculation.

---

[11] See United States v. Guerrero, 2015 WL 6958071, at *3 (D. Mass. Nov. 9, 2015) ("The cursory suggestion in [petitioner's] brief that he would have opted for a plea is belied by his conduct throughout the proceedings in his case."); Sanders v. United States, 341 F.3d 720, 723 (8th Cir. 2003) ("A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer."); Lafler, 566 U.S. at 171-72 (explaining that in determining a remedy where counsel is ineffective during plea negotiations, the court "may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions.").

13

Petitioner seeks an evidentiary hearing to address his counsel's reasons for allegedly assuring Petitioner he had a good case and proceeding to trial only to try the case for appeal, and for telling the jury in his opening statement that Dr. Wilking would testify truthfully. See Mem. ISO Mot. to Vacate at 1-2 [Doc. No. 410]; United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006) ("Sixth Amendment attacks on counsel . . . require findings as to what happened and, as important, why counsel acted as he did[.]"). But "[e]ven if a hearing is requested, a district court properly may forgo it when . . . the movant's allegations, even if true, do not entitle him to relief[.]" David v. United States, 134 F.3d 470, 477-78 (1st Cir. 1998). That is the case here: even if Petitioner's counsel committed the purported errors alleged by Petitioner, Petitioner would not be entitled to relief due to a failure to show prejudice. Therefore, Petitioner's request for a hearing is denied.

### III.   Conclusion

For the foregoing reasons, Petitioner's Motion to Vacate [Doc. No. 397] is DENIED.

IT IS SO ORDERED.

March 25, 2025                                       /s/ Indira Talwani
                                                     United States District Judge